FEATHER DELL RANDALL, APPELLEE AND CROSS-APPELLANT, V. ROBERT WILKINSON RANDALL, APPELLANT AND CROSS-APPELLEE.

345 N.W.2d 319

Filed February 24, 1984. No. 82-808.

Joseph J. Barmettler and Lyle E. Strom of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, for appellant.

Donald A. Roberts of Lustgarten & Roberts, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, SHANAHAN, and GRANT, JJ.

KRIVOSHA, C.J.

By this appeal we are asked to determine whether the validity of a marriage should be determined in accordance with the laws where the marriage was performed or pursuant to the laws where the parties reside. The trial court concluded that although the marriage was invalid under the laws where performed, it was "substantially" in accordance with the laws where the parties resided, and therefore should be recognized. Because we believe the trial court was in error, we must reverse and dismiss.

The appellee, Feather Dell Randall, and the appellant, Robert W. Randall, met sometime during the summer of 1963. At that time Ms. Randall was working as a receptionist to support herself and her infant son. By the late summer of 1963 the parties to this action had established a meretricious relationship. They were unable to marry because Mr. Randall was then married and did not obtain a decree of divorce until October 4, 1963. Under Nebraska law this meant that Mr. Randall was not free to marry anyone else *anywhere* in the world until April

5, 1964, a fact known to both Ms. Randall and Mr. Randall. *Copple v. Bowlin*, 172 Neb. 467, 110 N.W.2d 117 (1961); *Eaton v. Eaton*, 66 Neb. 676, 92 N.W. 995 (1902); *Lee v. Lee*, 150 Iowa 611, 130 N.W. 128 (1911).

While there is a dispute, we find from the evidence that in March of 1964 the parties traveled to Acapulco, Mexico, for the purpose of entering into marriage sometime while in Mexico. Prior to April 5, 1964, the first date both parties knew they were free to marry, they went to a local government office in order to obtain a marriage license. The parties answered questions concerning their origins, occupations, marital status, and other information; they were fingerprinted; and they signed their names to a document in Spanish, before four witnesses. At the conclusion of the proceedings they were congratulated by a Mexican official, who advised them that they were now married. The parties then advised the official that they could not get married until April 5, 1964, and both parties obviously recognized that whatever transaction took place before the Mexican official was not sufficient to cause them to be husband and wife under Mexican law.

The next day, on April 5, 1964, the parties drove to Mexico City, Mexico, to find an English-speaking minister by whom they could be married. Again, there is a conflict, but it appears clear from the evidence that both parties were advised by the minister that under Mexican law a religious ceremony was not valid unless there had earlier been a valid Mexican civil ceremony. By deposition, the minister testified that he specifically recalled advising the parties that in Mexico a religious ceremony had no legal validity. The religious ceremony was merely a "blessing" upon a prior civil marriage. Mexican law recognizes only those marriages which are performed in a proceeding before a Mexican civil authority. Civil Code of Mexico, tit. 4, ch. VII, art. 103b; tit. 5, ch. II, art. 146 (1964). Rev. Leonard Stahlke's testimony was supported by his wife, the

only other person present that evening. She testified that the minister carefully explained to both parties that the religious service he was about to perform would not constitute a legal marriage, nor would it have any legal effect on their prior civil marriage. She further testified that both of the parties seemed to understand. The record clearly establishes that no valid Mexican civil ceremony was ever performed, and therefore under Mexican law the religious ceremony was likewise invalid.

The parties left Mexico the next day and went to California for several days, and then returned to Nebraska where they have continuously resided. The evidence is without dispute that from the time of their return to Nebraska until the time they separated, the parties to this action cohabited in this state as husband and wife, filed tax returns as married persons, and otherwise conducted their business as husband and wife. The record further discloses that Mr. Randall adopted Ms. Randall's son by her previous marriage. The son has now reached his majority and is not involved in this action.

The trial court specifically found that the marriage performed in Mexico was void. It did find, however, that by applying Nebraska law the religious ceremony performed in Mexico substantially complied with the requirements of the Nebraska law and that therefore the parties in fact were husband and wife. The court then divided the marital estate between the parties, and directed Mr. Randall to pay Ms. Randall certain alimony.

Mr. Randall has now appealed to this court, assigning five specific errors committed by the trial court. Mr. Randall's principal assignment of error is that once the trial court determined that both of the marriage ceremonies performed in Mexico were invalid, and therefore failed to create a valid marriage, nothing more was required to be decided. We believe that Mr. Randall is correct in his assertion.

We have long held in this jurisdiction that the

validity of a marriage is generally determined by the law of the place where it was contracted. Specifically, we have said in *Abramson v. Abramson*, 161 Neb. 782, 787, 74 N.W.2d 919, 924 (1956): " 'The general rule is that the validity of a marriage is determined by the law of the place where it was contracted; if valid there it will be held valid everywhere, and conversely if invalid by the lex loci contractus, it will be invalid wherever the question may arise.' " See, also, *Scott v. Scott*, 153 Neb. 906, 46 N.W.2d 627 (1951); *Forshay v. Johnston*, 144 Neb. 525, 13 N.W.2d 873 (1944).

It appears to us that the rationale for this rule compels the result in this case. If indeed marriage is a contract, then it seems to follow that the validity of the contract should be determined by the law of the place where the contract is entered into, when entered into, and the validity should not be determined by hindsight. Other courts which have been called upon to decide this question have reached similar conclusions. In *Estate of Levie*, 50 Cal. App. 3d 572, 123 Cal. Rptr. 445 (1975), the California court held that the marriage between two California residents who went to Reno, Nevada, to be married was invalid in California because it was invalid under the laws of Nevada. The court stated at 576, 123 Cal. Rptr. at 447: "It is true that the statute . . . do[es] not speak expressly of the invalidity in California of a marriage which was void where performed. But the statute by implication adopts the common law rule that 'the law of the place of marriage controls the question of its validity.' "

Similarly, in *Gamez v. Industrial Commission*, 114 Ariz. 179, 559 P.2d 1094 (1976), the Arizona Court of Appeals held that if a marriage entered into in Mexico was invalid in Mexico then it was to be considered invalid in Arizona.

In *Copple v. Bowlin*, 172 Neb. 467, 110 N.W.2d 117 (1961), Elinor Campbell married Cecil Bowlin on December 18, 1952, in Nebraska City, Nebraska. They

obtained a proper license and had a proper ceremony. By this marriage one son was born, who was 6 years old at the time of Mr. Bowlin's accidental death in 1959. In denying workmen's compensation benefits because it appeared that the ceremony was performed 1 day before Mrs. Bowlin's divorce became final, we said at 471, 110 N.W.2d at 121: "The record shows that Elinor Bowlin was granted a decree of divorce from Arthur L. Campbell on June 18, 1952. This decree was not effective until December 19, 1952. § 42-340, R.R.S. 1943. It is clear that Elinor Bowlin was not free to enter into a marriage until 6 months after the date of her divorce from Arthur L. Campbell. Where a certain period must elapse before a divorce becomes final, in determining whether or not such period has elapsed, the rule is to exclude the first day and include the whole of the last day in said period. Garrett v. State, 118 Neb. 373, 224 N.W. 860. The evidence shows that the ceremonial marriage between Elinor Bowlin and the deceased was entered into in the utmost good faith. This is not, however, a matter that can be advanced to sustain the marriage. The statute is one of legislative policy involving a subject over which it has complete control. The wisdom of the legislation is for the Legislature, with which this court has no right to interfere. We necessarily conclude that Elinor Bowlin was the wife of Arthur L. Campbell at the time of her purported marriage to the deceased. As a result, her marriage to the deceased was wholly void and she was not the wife of Cecil Bowlin at the time of his death. Scott v. Scott, 153 Neb. 906, 46 N.W.2d 627, 23 A.L.R.2d 1431.''

Furthermore, even if we were to look to the law of Nebraska, which we have declared we should not, the marriage ceremony conducted on April 5, 1964, would have been invalid under Nebraska law. It is conceded by all of the parties that the religious ceremony performed on April 5, 1964, was not preceded by the parties' first obtaining a valid marriage li-

cense. Appellee argues that under Nebraska law the failure to obtain a license does not void the marriage. We are unable to understand how that argument is made, in light of the clear language of Neb. Rev. Stat. § 42-104 (Reissue 1978), which provides: "Previous to the solemnization of any marriage in this state, a license for that purpose *must* be obtained from a county court in the State of Nebraska, and no marriage hereafter contracted shall be recognized as valid unless such license has been previously obtained . . . ." (Emphasis supplied.) Ms. Randall argues that the statute may require that one obtain a license, but it does not make the failure to obtain the license grounds for voiding the marriage. We cannot imagine how the Legislature could make it any clearer than to say that "no marriage . . . shall be recognized as valid unless such license has been previously obtained." Ms. Randall specifically argues that, while reading that section alone, it might mean that the marriage is invalid, when one reads the entire act together, that language is not repeated in every section, and therefore the failure to obtain a license cannot cause the marriage to be invalid. Such an argument simply fails to recognize statutory rules of construction. The act is not to be read in fragments, but rather to be read in its entirety. See, *Little Blue N.R.D. v. Lower Platte North N.R.D.*, 206 Neb. 535, 294 N.W.2d 598 (1980); *School Dist. No. 17 and Westside Comm. Schools v. State*, 210 Neb. 762, 316 N.W.2d 767 (1982). One cannot create a valid marriage ceremony in Nebraska as if one were ordering from a menu in a Chinese restaurant, taking one from column A and one from column B. Under Nebraska law, failure to obtain a valid license prior to entering into the marriage ceremony invalidates the marriage. In view of the fact that Nebraska does not recognize common-law marriages, see *Abramson v. Abramson*, 161 Neb. 782, 74 N.W.2d 919 (1956), a marriage not entered into in accord with the requirements of Nebraska

law is no marriage at all, and, regardless of the sincerity of the parties, it fails to create the relationship of husband and wife. It is the requirement of obtaining the license and going through the ceremony which prevents common-law marriages from being valid in Nebraska. See, *Collins v. Hoag & Rollins*, 122 Neb. 805, 241 N.W. 766 (1932); *Ropken v. Ropken*, 169 Neb. 352, 99 N.W.2d 480 (1959); *In re Estate of McCartney*, 213 Neb. 550, 330 N.W.2d 723 (1983). The religious ceremony in Mexico, absent the issuance of a valid license, did not make the Mexican marriage ceremony valid in Nebraska, regardless of which law we look to for validity. This marriage was invalid under both Mexican and Nebraska law.

Having therefore determined that the marriage of the parties, though sincere, was invalid, the trial court was without authority to grant any further relief. In the *Abramson* case we said at 792, 74 N.W.2d at 927: "Having come to the conclusion that no marriage ever existed between these parties the following is applicable: ' "* * * The action was one in equity; both parties were asserting rights founded upon an illegal and void contract. In such a case, it is a well-settled rule that a court of equity leaves the parties to such a situation just where they placed themselves and as the court found them. . . ." ' "

Ms. Randall argues that even if the court determines that no valid marriage existed, the court nevertheless has jurisdiction to award a division of property under the provisions of Neb. Rev. Stat. § 42-378 (Reissue 1978), which reads: "When the court finds that a party entered into the contract of marriage in good faith supposing the other to be capable of contracting, and the marriage is declared a nullity, such fact shall be entered in the decree and the court may order such innocent party compensated as in the case of dissolution of marriage, including an award for costs and attorney fees." That section, however, has no application to the case at

bar. This is not a situation in which Ms. Randall was unaware that the parties could not marry until April 5, 1964, or that in Mexico a religious ceremony alone was insufficient to constitute a valid marriage. We believe the evidence is sufficient to establish that the information was known to both parties, and therefore the provisions of § 42-378 are not applicable.

While the facts of this case may create an unfortunate result, courts are without authority to correct every error. As we noted in *Ropken v. Ropken, supra* at 356, 99 N.W.2d at 484: "The powers of the court in a divorce action are statutory. Unless the source of the power is found in the statute, a court is without authority to exercise it.... 'Jurisdiction relative to divorce and alimony is given by statute, and every power exercised by the court with reference thereto must look for its source in the statute, or it does not exist.' " Being unable to find any such authority in the statutes, we are without right to make an award.

Therefore, we believe that with the exception of the temporary alimony paid by Mr. Randall to Ms. Randall pursuant to the court's authority prior to determining the invalidity of the marriage and pursuant to an agreement of the parties, all other sums ordered by the court to be paid to Ms. Randall, whether already paid or to be paid in the future, were beyond the court's authority and must be set aside. Ms. Randall, of course, is permitted to retain the property which she holds in her possession and which has been in her own name, having the apparent value of some $179,000, as well as the $36,000 that she received in support payments prior to the entry of the decree by the district court. All other sums ordered by the court, whether paid or not, must be set aside, and any sums paid by Mr. Randall to Ms. Randall in excess of those amounts which Ms. Randall is entitled to keep must be returned to Mr. Randall.

The judgment of the district court is therefore reversed and the action dismissed pursuant to this decree.

REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS.

CAPORALE, J., not participating.